UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JERRY STEWARD                                       CIVIL ACTION NO. 03-1962

VERSUS                                              JUDGE DOHERTY

ALBERTO GONZALES                                    MAGISTRATE JUDGE HILL
Attorney General of the United States

## MEMORANDUM RULING

Currently pending before the Court is a Motion for Summary Judgment [Doc. 58] by

defendant, the Honorable Alberto Gonzales, Attorney General of the United States, wherein

defendant seeks a judgment dismissing this matter in its entirety.  The motion is opposed by plaintiff.

All briefing has been completed and this matter is now under advisement by the Court.

Plaintiff, Jerry Steward, has sued defendant for race discrimination pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., which allegedly occurred while plaintiff

was employed as a Deputy United States Marshal ("DUSM") for the United States Marshals Service

("USMS").[1]  Three claims brought pursuant to Title VII are before the Court: (1) race discrimination

in the form of disparate treatment; (2) and hostile work environment; and (3) retaliation in the form

of adverse employment actions.[2]  [Docs. 1 and 38]

---

[1]  The United States Marshals Service is a component of the United States Department of Justice
("DOJ").  As Attorney General of the United States, Alberto Gonzales is the head of the DOJ, an agency
of the executive branch of the United States Government.  Attorney General Gonzales is sued only in his
official capacity as head of the DOJ and USMS.

[2]  The Court notes it has been somewhat difficult to discern exactly what causes of action are
before it.  While plaintiff's Complaint and Amended Complaint contain subheadings describing two
"counts" (one for "race discrimination," another for "retaliation"), plaintiff also describes in his
Complaint causes of action for hostile work environment (in a section entitled "Allegations" and in
Counts I and II) and constructive discharge (in the "Allegations" section).  At a telephone status
conference held August 31, 2006 the Court ordered plaintiff to produce an outline of his claims [Doc.
62].  In the outline, plaintiff identifies three claims: (1) retaliation, (2) "unlawful harassment in violation

# I. FACTS

Mr. Steward was employed by the United States Marshal's Service, Eastern District of

Louisiana, as a Deputy United States Marshal from October 1994 through April 2002.  He contends

throughout his employment he was subjected to racial discrimination, a hostile work environment,

---

of Title VII", and (3) "unlawful disparate treatment discrimination in violation of Title VII."  (This Court presumes claim number 2 contained in the outline is a term of art synonymous with "hostile work environment," as the elements for plaintiff's prima facie burden listed under claim number 2 in plaintiff's outline correspond to the elements required to support a claim for hostile work environment in the Fifth Circuit.)  The third claim in plaintiff's outline lists elements the Fifth Circuit considers in analyzing a "constructive discharge" claim, as well as elements in support of a claim for racial discrimination through disparate treatment.

However, "constructive discharge" (as well as denial of awards and/or bonuses and impingement of character and credibility) was addressed in a previously filed Motion for Partial Dismissal by defendant [Doc. 18].  Defendant argued these claims should be dismissed for failure to exhaust administrative remedies.  In response, plaintiff argued the above allegations were not separate claims (which would be subject to administrative exhaustion), but merely factual allegations in support of the claims of discrimination, hostile work environment and retaliation he submitted to the Equal Employment Opportunity ("EEO") Office with the DOJ.  The Motion for Partial Dismissal was denied in part due to plaintiff's assertion he was not bringing such claims. [Doc. 40] The Court specifically stated:

> As the Federal Rules of Civil Procedure require only notice pleading, the defendant is correct that the Amended Complaint could be interpreted as having raised the specific claims [constructive discharge, denial of awards and/or bonuses and impingement of character and credibility] which are the subject of the Motion to Dismiss.  However, the plaintiff has specifically declared he has not asserted these claims.  Thus, this Court accepts the plaintiffs' pleadings do not raise these claims.  The plaintiff has reserved his right, however, to pursue further claims and/or administrative proceedings in the event discovery leads him to conclude other claims should be pursued.  However, in light of plaintiff's assertion that he has not raised the claims at issue, such claims need not be considered until and **unless the plaintiff is granted leave to amend his complaint**. (emphasis added)

Id., n.2.  In plaintiff's Outline, submitted September 13, 2006, he states "plaintiff intends to file a Motion for Leave to Amend his Complaint to include a separate cause of action for constructive discharge." [Doc. 64, n. 7] To date, plaintiff has not submitted a motion for leave to supplement or amend his complaint.  As the deadline for amendment of pleadings has long since passed, and in light of his specific declaration he is not asserting claims for constructive discharge, denial of awards and/or bonuses and impingement of character and credibility, any cause of action based solely on those specific claims are not before this Court.  As such, the Court deems the claims before it to be:  (1) race discrimination in the form of disparate treatment; (2) and hostile work environment; and (3) retaliation in the form of adverse employment actions.

disparate treatment and retaliation, during and after his employment with the Marshals Service

ended.  Plaintiff alleges the retaliation began shortly after September 8, 2000, when he became a

class representative in a race discrimination lawsuit filed on behalf of all African-American DUSMs

against the United States Marshal Service.

**A.  Undisputed Facts**

Mr. Steward began his employment with the USMS on October 16, 1994 as a DUSM in the

Eastern District of Louisiana, New Orleans' office.  In October 1995, he was promoted to the

position of Deputy U.S. Marshal Criminal Investigator.  In October 1996 and 1999, he was again

promoted.[3]

From February 1995 through April 1996, Mr. Steward worked in the Court Operations

Section ("Operations") in the New Orleans' office.  In April 1996, he was reassigned to a task force

at the ATF-Safe Home where he worked for one year.  In April 1997, he was reassigned to the

National Asset Seizure & Forfeiture Section ("NASAF", also referred to as "Seized Assets") in the

New Orleans Office where he remained for approximately four years.

**B.  Disputed Facts**

Defendant argues an office reorganization plan was implemented in 1999 by former United

States Marshal for the Eastern District of Louisiana, Charles Serio.[4]  Marshal Serio testified his goal

with the reorganization plan "was to give everybody a chance to move around, because some people

---

[3]  It is unclear to the Court whether plaintiff's promotion was an actual advancement in his rank or position, or was merely an automatic increase to his salary due to his length of employment with the USMS.  The Statement of Uncontested Material Fact (to which plaintiff agreed) merely states: "In October 1996 and 1999, he was again promoted, respectively to GS-11 and GS-12." [Doc. 58-3]

[4]  Three U.S. Marshals served during Mr. Steward's employment: (1) James "Jim" Serio from 1978 to Nov. 1997; (2) Charles Serio (Jim Serio's son) from Nov. 1997 to June 2001; and (3) Theophile Duroncelet from June 2001 to present.  Unless stated otherwise, "Marshal Serio" refers to Charles Serio.

had been, in [his] opinion, stagnated or staying in the same area for long periods of time. ... So [he] implemented the open season with the goal that no one would be deprived of broadening their experience." [Serio depo., p. 42]  According to Marshal Serio, beginning in January 1999, an annual supervisor's meeting was held to discuss which deputy marshals should be transferred out of the section where they had been working to a new section.[5] [Id., pp. 42 - 43]  Approximately two months prior to the annual meeting, each deputy was asked to submit a ranking of their preferred section assignments.[6] [Id., p. 43]    According to Marshal Serio, at the meeting, the supervisors of each section determined which deputies would stay in their current sections and which deputies would be transferred.[7]  [Id., pp. 45-46]  Marshal Serio testified the supervisor deputies also rotated during "that cross training period" of his tenure.[8] [Id., p. 25]

**C.  Undisputed Facts**

In 2001, in accordance with the annual open season, ten deputies were reassigned within the New Orleans' office.  The reorganization became effective on January 29, 2001. Plaintiff's new

---

[5]  The "Supervisor Deputies" at that time were: Herman Brewer, Jr. (African-American), Ronald Gibbs (Caucasian), Ronald Couret (Caucasian) and Timothy Goode (Caucasian).  The parties have identified no other supervisor deputies during plaintiff's employment with the USMS.  Additionally, it appears there were three sections involved in the rotation plan: Operations, Seized Assets and Warrants. [Doc. 58, p. 19]

[6]  The portion of Marshal Serio's deposition provided to the court does not state exactly how the deputies "wish lists" [Serio p. 44] were used in the determination of which deputies should be transferred.

[7]  Marshal Serio's testimony is not abundantly clear as to exactly how this process worked.  At pp. 45-46 of his deposition, he testifies the supervisor who would be supervising a particular section after the yearly rotation was made was to pick the deputies who would work under him.  At pp. 48-49, he states the supervisors were going to select the deputies for the section over which the supervisor had authority, but that the supervisors who were rotating out of their last section to a new section were going to "dictate who was removed."

[8]It is undisputed that plaintiff remained in Seized Assets during the first two yearly rotation periods.

assignment was in the Court Operations Section.[9]

On February 1, 2001, Mr. Steward filed an informal EEO Complaint. On April 6, 2001, after receiving EEO counseling, he filed a formal Administrative Complaint. The Department of Justice issued its "Final Decision" on April 10, 2003. According to that Decision, Mr. Steward asserted claims of retaliation in the form of overt acts (the transfer/demotion), the existence of a hostile working environment (including suggestions that he would suffer consequences for having joined the class action), and race-based discrimination in the form of both overt acts and a hostile working environment. The DOJ found the USMS had not engaged in discrimination, retaliation or harassment against Mr. Steward.

On April 26, 2002, Mr. Steward left the Marshal's Service for employment at the Department of Homeland Security, Bureau of Immigration and Custom's Enforcement ("ICE"). On July 8, 2003, Mr. Steward filed the instant action for violations of Title VII. On July 28, 2004, he amended his Complaint to allege the Marshal's Service made false accusations and/or complaints about Mr. Steward to his new employer and publicized false accusations and/or complaints to employees of the USMS for the Eastern District of Louisiana.

**D. Plaintiff's Allegations in Support of His Claims**

In support of his opposition to defendant's motion for summary judgment, Mr. Steward has submitted the following allegations of fact and supporting evidence:

•        Beginning in 1997, the word "nigger" was used in the workplace and in Mr. Steward's presence on several occasions by Caucasian deputies, including Chris Peck

---

[9]  Defendant states in its memorandum in support of the Motion for Summary Judgment [Doc. 58] at p. 4 that "of the twenty-two line deputies in the Marshal's Service in the Eastern District of Louisiana, nearly half were rotated to new assignments." Defendant cites a portion of the EEO investigation file (Def. exh. F14(a) and (b)) in support of this assertion. While the Court agrees the cited documents reflect twelve deputies were rotated to new assignments, the Court is unable to ascertain from the documents the number of "line deputies" in the Eastern District of Louisiana's Marshal's Service.

and Tommy Boudreaux. [10] [Boudreaux depo., pp. 54-55[11]; Brewer depo., p. 46 (stating Mr. Steward complained to him about Dep. Boudreaux and Dep. Peck's use of the word "nigger"); Peck depo., pp. 67-68 (admits to using the word "nigger" but never in front of Mr. Steward or in "this office.")]  Plaintiff additionally testifies he has been told by three deputies they heard Dep. Peck call African-American people "niggers" in the workplace. [Plaintiff's Declaration, ¶13][12]

- Dep. Boudreaux stated in plaintiff's presence, "We stopped keeping rope in this office when we started hiring niggers." [Plaintiff's Declaration, ¶14]

- Mr. Steward alleges, "On another occasion, when U.S. Marshal James Serio, who is Caucasian, was out of the office with two African-American employees (myself and Herman Brewer), I heard that Dep. Tommy Boudreaux said, "The U.S. Marshal must be an oreo cookie." [Plaintiff's Declaration, ¶15; Boudreaux depo., pp. 103-104[13]; Chief Dep. U.S. Marshal David A. Zapalo's Affidavit, p. 5]

---

[10]  Other than Mr. Steward, Herman Brewer and Thedus Mayo (all African-American), no employee of the USMS mentioned in the pleadings has been identified as any race other than Caucasian.

[11]  Dep. Boudreaux admits in his deposition that he has used the word "nigger" "numerous times." However, he denies ever using that word while on duty with the Marshals.  When asked if he had ever been involved in any investigation by Internal Affairs about using the word "nigger," Dep. Boudreaux responded:

> A:      Probably so... you know, I really don't pay attention.  If its in the record, its there.  I don't know personally.  I don't recall if it was, because I just don't recall.  I mean you can make up anything you want.  So ...
> Q:      Just wasn't something important enough for you to care about?
> A:      That's exactly correct.  (pp. 55-56)

[12]  While this statement (as well as a few others in plaintiff's declaration) may be hearsay, defendant has lodged no objection to plaintiff's declaration.  Salas v. Carpenter, 980 F.2d 299, 304 (5th Cir. 1992) ("The court should disregard only the inadmissable portions of a *challenged* affidavit) (emphasis added).  Furthermore, the Court finds the vast majority of plaintiff's declaration is based upon personal knowledge.

[13]  When Dep. Boudreaux was asked if he made a statement about Marshal James Serio being an oreo cookie because he was with two African-Americans, he denied making that comment and clarified:

> I said I was looking for Jerry and Herman [both African-American] to do something, and I was told that he was out with Mr. James V. Serio.  And I said, 'I have a picture of that.  He must look like an oreo.'  That's what I said.  That was my statement. ... They must look like an oreo together...  Two blacks and a white, you get an oreo.

Dep. Boudreaux says he made the statement to the ladies in the Seized Assets Section, one of whom was Ms. Thedus Mayo, a female black employee who also filed a complaint against the USMS for discrimination and retaliation due to engaging in protected activity.

- In late 1997, Dep. Boudreaux, while in plaintiff's presence, stated to a deputy who had a watermelon, "Quick, hide, hide. You know they like watermelon. Don't let Jerry see the watermelon because he'll jump out and take it." [Plaintiff's depo., p. 43; Boudreaux depo., pp. 102-103[14]]

- Plaintiff alleges U.S. Marshals Jim and Charles Serio "were good friends with Mr. Boudreaux, knew about these incidents, but *never* spoke with or disciplined him." [Charles Serio depo., pp. 20, 104 (admits to being aware of the watermelon comment, and admits he never spoke to Dep. Boudreaux about his derogatory comments); Boudreaux depo., pp. 66-69 (admits he and Marshal Charles Serio are friends); Zapalo Affidavit, p. 5 (after Zapalo reported Ms. Mayo's complaints about the watermelon incident and the oreo cookie incident to U.S. Marshal James Serio, the Marshal "really did not do anything."); Goode depo. II, pp. 12-14 (Tommy Boudreaux was good friends with both Marshals Serio)[15]; Peck depo., pp. 88-89 ("Tommy's probably got the best seat in the house. ... Tommy's been here a long time. He's been through several different marshals. He's paid his dues, as he would call it.")]

- Plaintiff alleges he was denied training opportunities that were awarded to Caucasian deputies. More specifically, plaintiff alleges at some point during his service with the Marshals, he requested to attend Spanish school. He states he was told "they didn't have any money to send me to training," but two months later, Jacques Thibodeaux was sent to the same training program plaintiff had requested to attend. [Plaintiff depo., pp. 98-99]

---

[14] While Boudreaux admits he made the comment, he claims it was taken out of context.

[15] Supervisor Dep. Goode further testified:

If Tommy told you to do something, it pretty well would be a good idea if you did it ... I guess its because of his tenure and his relationship with both former Marshals Serio, Jim and Charlie, that Tommy had a free reign because of his senior status and his relationship with the family. ... I know that they were friends. I know that Tommy did all types of errands for Charlie's dad while his dad was the marshal and he did the same thing for Charlie when Charlie was the marshal.

Sup. Dep. Goode further testified it was his belief both Marshals Serio would have "backed" Mr. Boudreaux if he had a problem with another person in the office. He describes a specific incident which occurred while he was the supervisor of the Warrant Section (he has since left the USMS), where Dep. Boudreaux was assigned. Dep. Boudreaux was failing to show up timely for work. Sup. Dep. Goode "wrote up" Dep. Boudreaux and put him on leave without pay. The next day Sup. Dep. Goode received a radio transmission from Marshal Serio, who had Dep. Boudreaux sitting in the car with him. Marshal Serio told Sup. Dep. Goode to put Dep. Boudreaux on leave without pay. However, Sup. Dep. Goode later learned that Dep. Boudreaux's pay was never suspended. He states, "I was supervising him, but I really had no control over him. He answered directly to the Marshal."

- Plaintiff states he was denied a request to go to "special response training." [Id., p. 99]

- Plaintiff states while he was assigned the collateral duty of "District Recruiter," he was denied a request to attend the District Recruiter's School, but the Marshals then sent Bertie Deschamp, who was not a district recruiter at the time. [Id., p. 100]

- Plaintiff alleges on several occasions in late 1999, he asked his supervisor, Herman Brewer, if he could be considered for a position with the Electronic Surveillance Unit. Plaintiff states on each occasion, Mr. Brewer stated plaintiff could not apply for those positions, as they were not open to competition but were "hand picked" positions. Plaintiff alleges at the time he was interested in an ESU position, every person occupying those positions was Caucasian. [Plaintiff's Declaration, p. 4]

- In August 2000, Sup. Dep. Brewer and plaintiff were in the front seat of a vehicle, when Dep. Boudreaux, who was in the back seat, rolled down the window and said to two deputies, "This is not right. I'm supposed to be in the front seat driving. They are supposed to be in the back seat hand cuffed." [Plaintiff's depo., p. 48, Boudreaux depo., p. 114[16]] Plaintiff alleges he complained to Sup. Dep. Brewer about the incident, but Sup. Dep. Brewer did not do anything. Plaintiff further states Marshal Serio knew about the incident, but did not investigate it, speak with plaintiff about it, or speak with or discipline Mr. Boudreaux. [Charles Serio depo, pp. 103-104, 116-117.]

- In September 2000, Dep. Boudreaux said to plaintiff, "When I retire and am wheelchair-bound, you'll be pushing me in my wheelchair down the road and we're going to call it 'Driving Mr. Tommy' just like the movie." Plaintiff alleges this comment was racially motivated because in the film Driving Ms. Daisy, a Caucasian woman has an African-American limousine driver who is her servant. [Plaintiff's Declaration, ¶23][17]

- In late September or early October 2000, when Marshal Serio became aware of plaintiff's participation in a class action race discrimination lawsuit, he "became visibly upset and extremely pissed." Plaintiff further alleges Chief Dep. Zapalo told

---

[16] Boudreaux denies making that exact statement and clarifies, "I said I usually drive. I'm a driving instructor too. I like to drive. So anytime we go anywhere, I drive. And this is the first time, I think since I can remember, that I sat in the back and someone else drove. That's what I said. I said,... ." Plaintiff has not submitted the following page of Dep. Boudreaux's deposition testimony to the Court (and defendant has provided none of his deposition), so what exactly Dep. Boudreaux alleges he said is unknown to the Court.

[17] Plaintiff additionally cites to Dep. Boudreaux's deposition, p. 113, in support of this statement. However, plaintiff has not provided that page of Dep. Boudreaux's deposition.

him Marshal Serio was "pissed", "went ballistic" and said, "How could he file suit against the Marshals Service after all I've done for him and after I have left him in Seized Assets and not rotated him out?"  Additionally, Chief Dep. Zapalo told plaintiff the marshal took plaintiff's participation in the class action lawsuit personally, and the marshal would probably take him out of Seized Assets. [Plaintiff's Declaration, ¶24; Zapalo Affidavit, p. 3 (states Zapalo had a conversation with Marshal Serio about Mr. Steward's involvement in the class action the day after the Marshal was informed plaintiff had joined the class action suit.  During the conversation Marshal Serio, "Became visibly upset ... and stated that he just could not understand  why Jerry would take such an action since his dad, former Marshal James Serio 'did everything for Jerry.'" Chief Dep. Zapalo further testified he does not specifically recall telling Mr. Steward the Marshal was "pissed," but he may have.); Gibbs depo., pp. 29-32 (based on several comments Marshal Serio made within weeks of finding out about the lawsuit, he was upset and annoyed with Mr. Steward)][18]  Plaintiff further alleges knowledge of his participation in the lawsuit spread throughout the office.  [Goode depo., pp. 44-45; Gibbs depo., p. 50][19]

•     Plaintiff alleges immediately after Marshal Serio found out about the class action lawsuit, during a supervisor's meeting regarding section assignments, Marshal Serio "effected Mr. Steward's removal from Seized Assets." [Doc. 78, p. 5; Gibbs depo., pp. 14, 16, 39 (Gibbs believed Marshal Serio wanted plaintiff moved out of Seized Assets although it was not explicitly stated.  The U.S. Marshal had the final say so as to who would be moved, and if the supervisors knew who the Marshal wanted to be moved, the supervisors were likely to do what the Marshal wanted.)][20]  Sup. Dep. Brewer, who was Mr. Steward's supervisor in NASAF prior to his and Mr. Steward's contemporaneous transfer, testified that had the decision been up to him, Mr. Steward

_____

[18]  Plaintiff additionally cites Sup. Dep. Brewer's depo., p. 22, alleging Sup. Dep. Brewer stated, "That there was friction between Mr. Steward and the Marshal after Mr. Steward joined the lawsuit and that he thought Mr. Steward would be removed from his position in Seized Assets as a result."  No such testimony is contained at p. 22 or the pages provided immediately surrounding p. 22 of that deposition.

[19]  Plaintiff additionally cites to Dep. Boudreaux's depo., p. 53 and Dep. Pike's depo., pp. 37-39 in support of this allegation.  However, none of those pages have been provided to the Court.

[20]  Plaintiff additionally cites Sup. Dep. Brewer's depo., pp. 19-20, stating, "Sup. Dep. Brewer testified that Marshal Serio explicitly stated his desire to have Mr. Steward removed from Seized Assets."  No such testimony is contained in the cited pages.  The Court does note at pp. 34-35, Mr. Brewer testifies that when he learned plaintiff had joined the class action and plaintiff wanted Mr. Brewer to join, he told plaintiff he was going to get taken out of NASAF.  When asked why he made that statement to plaintiff, Mr. Brewer responded, "Well, the Marshall at the time was, you know, like you cross me, I get you type of guy, you know. ... You know, he kind of set the pace that either go along with what I, you know, my program, my agenda, or, you know, you against it, you know.  And I just had that feeling."  When asked if he thought the Marshal had something to do with plaintiff's removal from NASAF, Sup. Dep. Brewer responded, "Yes.  He was running the office."

would have stayed in Seized Assets.  He testified plaintiff received awards from him every year.  [Brewer depo., pp. 20, 34-35, 58, 62 and 78]

- Sup. Dep. Brewer additionally testified that Mr. Steward was permanently assigned to Seized Assets by Marshal Jim Serio.  Even after Marshal Charles Serio started the rotation plan, the senior deputies (i.e. Jerry Steward in Seized Assets, Tommy Boudreaux in Warrants, and Tim Goode/Bob Bruno in Operations) were to remain in their respective sections.  [Brewer depo., pp. 4,10, 17-18, 70-71 ("And, you know, it was a rotation factor there, but at the same time you also kept your senior guy there."); plaintiff depo., pp. 34, 108, 111-112; Serio depo., pp. 114-115 (admits it is accurate to say he wanted to have a deputy marshal stay in each section who had a lot of experience.)]

- Sup. Dep. Brewer further testified that at the meeting where the decision was made to remove plaintiff from his position, Sup. Dep. Brewer suggested Dep. Boudreaux be moved out of Warrants (the division to which Sup. Dep. Brewer was transferred), because Dep. Boudreaux had been in that department for over ten years and Sup. Dep. Brewer, as the incoming supervisor of the Warrant Division, was supposed to have the authority to select which deputies were to be removed.  [Brewer depo., pp. 19-20, 58, 60, 63, 78; Serio depo., pp. 43-46 (the supervisor should be able to pick which deputies work in their section.)]  Sup. Dep. Brewer testified his request to remove Mr. Boudreaux was denied with the explanation, "Tommy was like the Street Supervisor and how important he was and they needed him and, you know, this and that, so the bottom line, it - - and then the funny part was, okay, Jerry's situation happened first where he was taken out. ... So the same justification that was used to get Jerry out of NASAF to me should have been used to take Tommy out of Warrants." [pp. 20, 22; see also Goode depo., p. 71 (Boudreaux was given preferential treatment by both Marshals Serio); Gibbs depo., pp. 53-54 (during the majority of his career, Boudreaux was in Warrants, except for two periods of time when Boudreaux was assigned to Operations because of complaints made about Boudreaux); James Serio, Jr. depo., pp. 48-49.]

- Plaintiff alleges on November 28, 2000 (around the time of the meeting where plaintiff was removed from Seized Assets), Dep. Boudreaux stated to plaintiff in Chief Dep. Zapalo's presence, "Ya'll got a lawsuit." When plaintiff asked what he was talking about, Dep. Boudreaux responded, "I heard you people got a class action lawsuit going on.  I hope you get a lot of money.  You'll need it to buy a car.  The Marshall is going to take your G-ride away from you."[21]  Dep. Boudreaux, who is Caucasian, then put his hand down next to Mr. Steward and said, "Do you think I can

---

[21]  While there is some indication "G-ride" means "government vehicle," this Court has never heard the term "G-ride" used as shorthand for a government vehicle.  However, the inference of plaintiff's argument is the term has other, perhaps more pejorative meaning.

pass to get in on the lawsuit?" Plaintiff asserts Chief Dep. Zapalo took no corrective action, and Dep. Boudreaux was not disciplined. [Plaintiff's Declaration, ¶7, Zapalo Aff., pp. 5-6 (confirms the statements were made but does not remember Boudreaux putting his hand next to plaintiff and asking if he could pass to get in on the lawsuit; Zapalo further states, "Tommy is always goofing around and running his mouth regardless of whether he knows what he is talking about. He might have made these comments just to get a reaction from Jerry. I did not report Tommy's comments to Charles Serio.")] According to plaintiff, Chief Dep. Zapalo said, "Tommy, you'll never fucking learn. I am glad you are at retirement age." [See Zapalo Aff., p. 5; see also Boudreaux depo., p. 123 (admitting the comment was likely made to him by a supervisor.)]

- On or about January 8, 2001, Sup. Dep. Brewer told plaintiff he was "demoted effective January 29, 2001 saying 'the Marshal moved you out of Seized Assets. You're going in Operations.' When Mr. Steward asked why, Sup. Dep. Brewer said, 'You know why. Because of the class action lawsuit you joined.'" [See pl. opp. memo., p. 7; Plaintiff's Declaration, ¶¶26, 27; Brewer depo., pp. 22, 79-80] Plaintiff further alleges on the same day, Sup. Dep. Couret apologized to plaintiff for being taken out of Seized Assets and explained his hands were tied because, "a deal was cut" prior to January 8, 2001. [Plaintiff's Declaration, ¶29] Plaintiff additionally testified when he was moved to Operations, the government vehicle assigned to him since April 1997 was taken away. Plaintiff testified he had been allowed to use the vehicle to commute to and from work during part of his tenure in Seized Assets. [Plaintiff depo., pp. 61-62.]

- Plaintiff alleges the same day (on or about Jan. 8, 2001), someone put a large amount of white grease under the handle of the driver's door and on the driver's window of the government vehicle assigned to him while it was parked in the parking garage at the federal building. Specifically plaintiff states, "Somebody put a combination of vaseline and lotion all -- I mean, they just stockpiled it under the door handle and smeared it all over the front passenger glass, front driver's glass." [Plaintiff depo., p. 51.] Plaintiff immediately reported the incident to Sup. Dep. Brewer. Plaintiff argues, "Marshall Serio was informed about this event, but wrote it off as a joke rather than taking any corrective action." [Pl. opp. memo., p. 8, citing Serio depo., p. 35 in support][22]

---

[22] Following the Court's independent review of the pages preceding and following page 35 of Serio's deposition, it appears Marshal Serio testified *others* in the office thought it was a practical joke and told Serio it was a practical joke. However, because Herman Brewer had brought the matter to his attention, Marshal Serio did not think of it as a practical joke. He testified he addressed it with the staff as a serious matter, and that his understanding was, "Jerry thought somebody was messing with him and not in a joking way." He states he told his staff if this was a practical joke, the jokes will cease in the office, and then directed Chief Dep. Zapalo to put out a memo that there would be no more practical jokes in the office. [pp. 31, 33-35.]

- On Thursday, January 11, 2001, Mr. Steward states Dep. Boudreaux intimidated and ridiculed him by walking through the Seized Assets office and asking loudly, "Does anyone have any extra vaseline, lotion or mayonnaise that I can borrow?"  Mr. Steward states he was very upset and offended by Boudreaux's comments, because he believed Boudreaux was ridiculing him for his complaint.  He further states he did not report this incident to anyone because he felt his other complaints of discrimination had resulted in retaliation, and he feared further retaliation. [Plaintiff's Declaration, ¶31.]

- Sometime between January 8 and January 29, 2001, "Dep. Tommy Boudreaux walked up to me and said that he thought I was different, but now he sees I am just like the rest of 'them' who like to complain and file lawsuits.  By saying 'them,' he was referring to African-Americans." [Plaintiff's Declaration, ¶32.] During this time period, Dep. Boudreaux additionally harassed Mr. Steward by saying he was just participating in the race discrimination lawsuit to get money.  Marshal Serio heard these comments and did nothing to stop them. [Serio depo., pp. 101-109 (admitting Deputies Peck and Boudreaux made these comments to him on several occasions, but he does not "really entertain discussions like that.  It's just a comment that they make as I pass by pretty much.")][23]

- On January 29, 2001, Mr. Steward was informed he would no longer perform the collateral duty of "District Recruiter," and his new collateral duty assignment was "Assistant Community Detention Officer," which "deals" with prisoner property.  Plaintiff states, "Handling prisoner property was known for being the worst, or at least very undesirable, collateral duty in the Marshal's Service." [Doc. 78, p. 9; Serio depo., pp. 87-88 (in the deputies's eyes, prisoner property is a collateral duty that is considered a headache and requires a lot of work: paperwork, bagging, boxing, mailing, accepting phone calls from prisoner family members); Brewer depo., pp. 38-39 ("Recruiter" is a more prestigious position and "you look at the two positions, it's like one is at the top and one is at the bottom of the ladder of responsibilities."); plaintiff depo., pp. 64-66; Goode depo., p. 39; Gibbs depo., p. 19; Peck depo., p. 25.]

- On or about April 11, 2001, plaintiff was passing through the courthouse screening area just behind Sup. Dep. Gibbs. Court Security Officer ("CSO") William Roth said to Sup. Dep. Gibbs, "Look out, there's a black guy with a gun behind you.  You better be careful.  He may rob you on the elevator." [Gibbs depo., pp. 40-43; plaintiff Declaration, ¶38.]  Plaintiff states:

  > I had been complaining about race discrimination for years, but this was the first time the management seemed at all interested in or concerned about what had happened, I was very offended because the

---

[23]  Plaintiff additionally cites Boudreaux's depo., pp. 32-33; these pages have not been provided to the Court.

only reason I think they were interested was because I was participating in the class race discrimination lawsuit. [Plaintiff Declaration, p. 11]

Sup. Dep. Gibbs testified he (Gibbs) immediately reported the incident to Chief Dep. Dixon (the acting chief at the time who had replaced Chief Dep. Zapalo), called Bill Roth and discussed the issue with him, made a call to the contractor for the Court's Security Officers, and believes he and Chief Dep. Dixon made a call to "headquarters" (the entity that monitors the Court security contract). Sup. Dep. Gibbs believes Mr. Roth was reprimanded but has no first hand knowledge. [Gibbs depo., pp. 40-42.] Plaintiff asserts Marshal Serio took no corrective action.[24]

• Plaintiff testified:

On May 18, 2001 (the day after the Marshal's Service Internal Affairs interviewed Tommy Boudreaux and Chris Peck), according to Troy Oberly and Herman Brewer, Dep. Chris Peck told Dep. Troy Oberly that I should not be trusted, that I should be ostracized and maybe I will leave the District if I am given that treatment and anyone who is seen talking to or socializing with me will be treated the same way. They told me that Chris Peck said, 'There are two teams, Jerry's team and the Marshal's team and if you're on Jerry's team you get the same treatment as Jerry.' I thought that the Marshal was aware that Chris Peck had made these statements. [Plaintiff's Declaration, ¶39.]

Plaintiff further states on or about May 21, 2001, Deputies Joe Lanasa and Kelly Lasher told him that Dep. Peck had told them they should not speak with plaintiff and should ostracize plaintiff so he would leave the district. [Plaintiff's Declaration, ¶40; Brewer depo., p. 49]

• Plaintiff testified sometime in 2001, Mickey Doll, a former deputy who was a court investigator for the Fifth Circuit came to visit plaintiff's office. He was in the Operations area with plaintiff, Sup. Dep. Gibbs and others. Mr. Doll said, "Watch what you say to Jerry. He's involved in a lawsuit." At some point during that visit, Mr. Doll also said things that were "off color" about Mr. Steward's children with a racial connotation. [Gibbs depo., p. 48.]

• Mr. Steward alleges in 2001 and 2002, deputies avoided working prisoner coordination trips with him and certain details. [Plaintiff's Declaration, ¶¶ 41, 42.]

---

[24] Plaintiff cites p. 165 of Serio's deposition in support. However, a review of the surrounding pages of that deposition show Marshal Serio testified because the CSOs are subcontractors from a private company, the Marshals are not allowed to take any disciplinary action against them. All disciplinary action is handled by headquarters.

- On January 23, 2002, Dep. Peck stated in plaintiff's presence, "What about, what about the jungle bunnies around here?" [Plaintiff depo., p. 45]  Plaintiff alleges Sup. Dep. Couret laughed with Mr. Peck about this comment.[25]

- Plaintiff alleges employees were moved out of their assigned sections and into the Operations Section as punishment. [Gibb depo., pp. 53-56; plaintiff depo., p. 107]

- Plaintiff alleges after joining the class action lawsuit, he was no longer sent on "multi-duty details" at off-site locations "with deputies from around the country to assist another district because of a special need," no longer received time off and no longer received cash awards, as he had prior to joining the lawsuit.

- Plaintiff alleges he left the Marshal's Service in April 2002 because he felt he had no other option.  He states due to the ongoing racial harassment, including the recent "jungle bunnies" comment, as well as being retaliated against and ostracized, he eventually found it very difficult and emotionally taxing to come to work each day. He states as a deputy, he was concerned for his safety because he did not feel he could trust his co-workers in any situation, let alone a dangerous situation that could arise from the nature of his work. [Plaintiff's depo., pp. 81-82.][26]

- Following Mr. Steward's resignation, Chief Dep. Dixon wrote a letter to Mr. Steward's new employer, the Air Marshal, falsely alleging plaintiff was improperly contacting employees of the U.S. Marshal's Service. [Plaintiff's Declaration, ¶51; plaintiff exh. 23 (Letter from the Assistant Director of the Federal Air Marshal Service regarding complaints made to the Air Marshal Service by Chief Dep. Dixon.); plaintiff exh. 24 (e-mails from a USMS Equal Employment Opportunity Office employee regarding retaliatory actions of Chief Dep. Dixon.)]

**E. Defendant's Response to Plaintiff's Factual Allegations of Racially Discriminatory Conduct**

Defendant, in its reply memorandum [Doc. 81], responds to plaintiff's allegations as follows:

- Despite plaintiff's subjective belief he was demoted from Seized Assets to

---

[25]  None of plaintiff's citations support the allegation that Dep. Couret laughed about the comment.

[26]  Plaintiff further testifies:

I had wanted to be a U.S. Marshal when I was a kid.  Growing up I saw pictures of them doing different things.  I remember them being associated with escorting African-American students to college when desegregation started to happen.  I looked up to them.  I really liked the silver badge they had.  It was very upsetting when this job I admired and respected as part of our federal justice system treated me unfairly because of my race and retaliated against me.  It was very difficult to come to work each day. [Plaintiff's Declaration, ¶47.]

Operations, "it is undisputed that the intra-office reassignment and realignment of collateral duties did not result in a loss of grade, pay, or other benefits." [Doc. 81, p. 2]

•   Defendant alleges plaintiff admitted in his deposition and in his recent declaration that he previously performed duties in the Operations Section prior to his assignment to Seized Assets.[27]

•   Defendant argues, "Plaintiff claims that his assignment to Seized Assets was permanent, but there is no personnel document to support this."

•   Defendant argues that because Seized Assets is a small section whereas Operations is a large section, a deputy in Seized Assets has a much greater likelihood of being transferred during the annual rotation than a deputy in Operations.

•   Defendant asserts:

> The analysis undertaken in determining which deputy should be moved includes whether a deputy would benefit from a move. The supervisory deputy who oversaw plaintiff's most recent performance determined that he should be moved. The criteria was not whether the deputy had dropped below a satisfactory performance, but whether he appeared bored, and whether he would benefit from a reassignment. That determination was made by Supervisory Dep. Ronald Couret. According to Couret, he made that decision without input from any other officer or the Marshal, and it was based upon his observation of plaintiff's work.[28]

---

[27] No citation to an exhibit or page number is provided. However, upon independent review of plaintiff's declaration, he does state he worked in Operations immediately upon graduating from the Marshal's Academy in 1995 until April 1996. However, he argues the "transfer" was actually a demotion because it is the least desirable assignment for a deputy, "assignments to Operations for someone in the middle of their career is known to be demeaning and a punishment," and "usually Operations is for new hires and employees who are ready to retire." [Plaintiff's Declaration, ¶29.]

[28] Defendant cites Ronald Couret's Affidavit in support. This Court's review of that affidavit, as well as an independent review of Sup. Couret's deposition, show that Couret became supervisor of Seized Assets in January of 2000 and transferred to the Warrants Section in the middle of August 2000. Sup. Dep. Couret remained Supervisor of the Warrants Section until at least June 12, 2001 (the date of his affidavit). As Marshal Serio testified open season was typically conducted two months prior to the end of the year (i.e. November 2000), the Court is perplexed as to why Sup. Couret would make the decision to transfer plaintiff from Seized Assets effective January 29, 2001, when Sup. Couret was no longer working in that department as of November 2000.

Furthermore, exactly who was supervising the Seized Assets Section at the time of the decision to transfer plaintiff is unclear to the Court from the documents provided. Plaintiff asserts Sup. Dep.

-15-

- Defendant states,

    > Plaintiff's declaration resurrects a litany of perceived racial slights over a ten year period.  Cobbled together, plaintiff asserts that these "incidents" demonstrate that he worked in a racially hostile environment.  He contradictorily stated in his 1998 affidavit that he either could not recall when incidents occurred or stated that they were not discriminatory.[29]

- Defendant argues the two times plaintiff complained to management, the incident was promptly addressed.[30]

---

Brewer was his supervisor at least until Jan. 29, 2001.  (See Plaintiff's Declaration, ¶32; pl. opp. memo., footnote 12.)  The Court's independent review of Mr. Brewer's deposition shows he testified that he moved from Seized Assets to Warrants in January of 2000 (p. 10), however at page 66 plaintiff's counsel prefaces a question with "now, historically when you worked in Operations before the change, before 2001...." with the inference being that Sup. Dep. Brewer worked in Operations at the time the decision was made to transfer plaintiff to Operations.  To add to the confusion, Couret's affidavit states at the time of the last open season preceding plaintiff's transfer, Couret was going to move from Seized Assets to Warrants, and Herman Brewer was moving from Warrants to Seized Assets.

[29]   Defendant cites plaintiff's 1998 affidavit, which was created in connection with Ms. Thedus Mayo's suit against the USMS for racial discrimination and retaliation.  While plaintiff does state in his affidavit he cannot recall comments (i.e. racial slurs) directed at any employees in an offensive manner, and that he had not suffered racial slurs by Dep. Boudreaux, he later states, when asked if he wanted to add anything to his affidavit, "First of all, the oath that I was given [prior to providing affidavit] is incorrect when it comes to freely and voluntary.  The whole race issue cannot be resolved in a couple of incidents confined to the U.S. Marshal Service.  Why now all of the concern about racial 'equality' when Negros, Native Americans, Asians and other minorities have been discriminated against for decades?  This overall complaint process has got to be the biggest fleecing of America."  Whether plaintiff's 1998 affidavit contradicts plaintiff's current allegations, and/or whether the preceding statement found in the 1998 affidavit is a repudiation by Mr. Steward of the 1998 affidavit is an issue for the trier of fact.  See e.g. Dibidale of La., Inc. v. American Bank & Trust Co., 916 F.2d 300, 307-08 (5th Cir. 1990).

[30]   Defendant provides no evidence in support of this statement.  Presumably, defendant is referring to the comment made by the CSO, and the "practical joke" involving plaintiff's government vehicle.  Additionally, plaintiff states in his opposition, when asked at his deposition about several of the comments and why he did not complain earlier about the treatment, he explained:

> I didn't think it would, it would do any good.  I mean, management heard it.  Everybody in the district knew about it.  Everybody knows about Tommy Boudreaux.  Everybody knows about Chris Peck, their racial slurs, their racist attitude.  Management knows about it.  But no one has ever done anything.  And I knew the moment I spoke up what's going to happen.  They were going to start retaliating against me, making life miserable for me.  They've done it in the past.  And what would make them not do it again.

(Plaintiff cites Mr. Steward's depo., pp. 104-05.  Plaintiff has only provided the Court with p. 104, which

- Defendant cites former Chief Dep. Zapalo's affidavit, wherein he states he met with plaintiff and asked him if he was working in a hostile environment, and plaintiff answered negatively. [Doc. 58, exh. 3, EEO file p. 168.]

- Defendant argues, "A review of plaintiff's declaration makes it clear that the totality of his claims do not rise to the level of an actionable hostile environment claim.  The alleged acts complained of were sporadic, not pervasive, and not severe." [Doc. 81, p.5]  And later, "In sum, these incidents lack racial animus, are episodic, and are not pervasive or severe." [Id., p. 7]

- With regard to plaintiff's allegation Dep. Boudreaux stated, "We stopped keeping rope in this office when we started hiring niggers," defendant counters, "There is no evidence that plaintiff complained to management, which indicates the degree to which it was offensive to him." [Doc. 81, p. 5] Defendant states the comment occurred in 1997 at the latest.[31]

_____

does not contain the testimony above.)  Plaintiff then argues exactly what he predicted happened: as soon as he engaged in protected activity concerning his treatment, the retaliation began.

[31] Defendant has cited the Court to no policy by the USMS requiring employees to submit such complaints to a manager prior to filing an EEO complaint. Of interest, plaintiff has provided a document entitled United States Marshals Service, Policy Notice, effective April 27, 1995 [Plaintiff exh. 16], which states in pertinent part:

> Racial slurs, ethnic jokes, obscene, abusive or insulting comments (hereinafter racially/sexually offense language) are unprofessional, inappropriate and will not be tolerated within the USMS work environment. ...

> The use of racially/sexually offense language disrupts the operations of the work place and undermines the integrity of the employment relationship. As USMS employees working for a law enforcement agency with a history of civil rights enforcement, we must set a positive example within the law enforcement community.  Thus, I expect all employees of the USMS to refrain from and to maintain a work environment free of racially/sexually offensive language.  The key to developing and maintaining a conducive work environment is to treat each individual with mutual respect, fundamental fairness, and decency. ...

> Each manager and supervisor is individually responsible for setting a good example, ensuring the workplace is free of racially/sexually offensive language, and for developing a fair and decent work environment where every employee is encouraged to participate fully in every aspect of the Service.  A manager/supervisor can help prevent sexual harassment by demanding and demonstrating professional behavior at work, refraining from using racially/sexually offense language and letting subordinates know when their language is inappropriate.  In addition, where a manager or supervisor has identified a situation involving racially/sexually offensive language, he/she is responsible for taking immediate corrective action.

- Defendant states plaintiff did not complain about the "oreo cookie" comment, which defendant alleges occurred in 1997 at the latest, because it involved Marshal J. Serio who retired in 1997.
- With regard to the watermelon comment by Dep. Boudreaux, defendant states plaintiff did not complain about the comment, "denied it occurred in his 1998 affidavit, but acknowledges it occurred in 1997.[32]

- With regard to the "driving Ms. Daisy" comment, defendant argues this was "obviously a satire" and "there is no evidence that these statements had racial animus." [Doc. 81., p. 6][33]

---

While all racially/sexually offensive language cannot be defined, following are some scenarios of the types of language which could be deemed offensive to another employee:

(1) several employees exchange ethnic jokes; ... (3) an employee discusses the perceived stereotypical behavior of a group of people; ... (5) a co-worker makes less than favorable comments about another co-worker's racial heritage; ...

Any employee who engages in the use of racially/sexually offense language is subject to **severe discipline up to and including removal**.  Thereafter, if an employee engages in a continuing pattern of racially/sexually offensive language he/she will be subject to removal from the federal service.

Management is responsible for reporting the use of racially/sexually offense language to the employee and labor relations branch, the Equal Employment Opportunity (EEO) Office, or the Office of Inspections.

Any manager who condones or fails to correct such racially/sexually offense language and/or fails to report a continuing pattern of this language shall also be subject to discipline.

In accordance with the USMS Code of Conduct, I expect all USMS employees to demonstrate the highest standards of personal and moral conduct expected of law enforcement officers and government employees, and to be courteous and respectful to all other USMS personnel and to the general public.

[32] Defendant cites plaintiff's 1998 affidavit and p. 47 of plaintiff's deposition in support.  The Court notes plaintiff did not deny the incident occurred in his 1998 affidavit but was merely silent on the issue.  Furthermore, none of the supporting evidence cited by defendant shows plaintiff acknowledges this incident occurred in 1997.

[33] Defendant cites plaintiff's declaration, paragraphs 23 and 25, as its sole support for this argument.  While paragraph 25 has nothing to do whatsoever with this comment, paragraph 23 explicitly states, "This comment was racially motivated because in the film 'Driving Ms. Daisy' a Caucasian woman has an African-American limousine driver who is her servant."  Additionally, plaintiff correctly argues  his prima facie burdens do not require he prove the remarks had racial animus; rather (with regard to hostile work environment), the conduct complained of must merely be based upon race. [Doc. 85, p.8] Whether Dep. Boudreaux's comment was or was not based upon race must be decided by the trier of fact

- With regard to the placing of a greasy substance on plaintiff's assigned government vehicle, defendant argues "there is no evidence of racial or retaliatory animus," this was "nothing more than a practical joke intended for someone else," and when Marshal Serio was made aware of the incident he responded and addressed the situation. [Doc. 81, p. 6]

- With regard to the comment made by the CSO, "Lookout, there's a black guy with a gun behind you," defendant states plaintiff concedes the comment was not made by a Marshal employee.  Furthermore, Sup. Dep. Brewer and Marshal Serio addressed the inappropriate behavior by requesting the CSO contractor discipline the CSO.[34]

- With regard to Dep. Peck's comment about "jungle bunnies," defendant argues the matter was investigated by management, Dep. Peck testified he apologized to
- plaintiff and the apology was accepted.[35] [Doc. 81, p. 6]

---

rather than this Court.

[34] The Court notes this incident (and request the CSO be "disciplined") occurred five days after plaintiff filed his formal Complaint with the EEO.

[35] Plaintiff testified Dep. Peck apologized, but specifically states he did not make any statement that he was not offended by the comment or accept the apology.  Dep. Peck's testimony is as follows:

Q:  What's a jungle bunny? ...
A:  A jungle bunny is a military term we used in the Philippines.  I was there for a year doing jungle ops. And it is a term used for a woman that they live in the jungle in the huts that will service you sexually if you want for items you might want to trade, food or whatever.
Q:  Prostitute, a whore?
A:  I guess. ... I don't know about prostitute or whore.  I think these people are – I mean, they live in huts.  They don't have electricity.  They don't eat good.  You know, I mean, you know, I guess maybe they're just trying to better themselves, but they're using sex to do it. ...
Q:  A derogative term though? ...
A:  Yes.
Q:  Are there any Filipinos that work in the Marshal Service in the Eastern District of Louisiana?
A:  Uh-uh (negative reply).  No.
Q:  Any women that work in the U.S. Marshal Service in the Eastern District of Louisiana that exchange money, sex for money --
A:  I hope not. ...
Q:  Are you aware of any other interpretations for that term jungle bunny?
A:  I am now.
Q:  Okay.  And what else does it mean?
A:  I don't know what it means, but I guess it's a racial thing. ...
Q:  Okay.  And sort of can you explain it to me how?  How is that a racial term

-19-

- With regard to plaintiff's complaint about the letter sent by Chief Dep. Dixon in 2004 to plaintiff's new employer, defendant argues, "Nothing adverse occurred to plaintiff as a result of the letter. Plaintiff conceded in his deposition that he was promoted by his new employer not long after the letter." [Doc.81, p. 8; plaintiff depo., p. 97]

- Defendant argues plaintiff alleges merely four separate incidents in support of his claim for "retaliatory harassment," three of which occurred over at least a five month period in 2001, and "even in the light most favorable to plaintiff, these facts are insufficient for a finding that harassment was severe or pervasive."[36] [Doc. 81, p. 78]

---

against black people?

A:  I don't know. I was told that it was and that I shouldn't – let me just tell you. I think it was Ron Couret maybe said something about dust bunnies or something about bunnies in the hallway, and I said, "What? Jungle bunnies?" And after that they [Ron Sup. Dep. Brewer and Tim Goode] pulled me to the side and said, "You can't say that." I said, "Why not?" You can't say that. That's a racial thing. You can't say that word. ... [After being pulled aside] that's when we, myself and Jerry and Tim, they asked Jerry if he was offended by it, and which he said no. ...

* * *

A:  Couret pulled me to the side with Tim and said, "You can't say that. That's a racial word," blah, blah, blah. ... So he [Couret] asked Jerry if he was offended by that word. Jerry had been in the military before. Jerry said, "No. I'm not offended by that word." And I thought that was the end of it.

Q:  Was it the end of it?

A:  I guess not. We're here.

Q:  And you weren't disciplined for that?

A:  No. He wasn't offended by it.

The testimony shows no apology was made. While perhaps the intended meaning of the term is an issue for the trier of fact, Dep. Peck's explanation as given grants this Court great pause and the Court notes the comment and explanation given – no matter to whom it was directed or which explanation is accepted – are open to interpretation as discriminatory and offensive by any recipient, but the Court merely notes the incongruity of such comments within the agency policy which declares as "a law enforcement agency with a history of civil rights enforcement...[the USMS] expects the highest standards of personal and moral conduct expected of law enforcement officers and government employees, and [its employees] to be courteous and respectful to all other USMS and to the general public." [Plaintiff exh. 16]

[36] According to defendant, the only allegations Mr. Steward has made in support of "retaliatory harassment" are: (1) the comment by Dep. Boudreaux that plaintiff was "like the rest of them who liked to complain and file lawsuits"; (2) Dep. Peck's comment, "There are two teams, Jerry's team and the Marshal's team"; (3) Dep. Doll's comment "Watch what you say to Jerry. He's involved in a lawsuit"; and (4) the letter from Chief Dep. Dixon to plaintiff's new employer. Defendant then states, plaintiff additionally believes that the January 2001 "greasy handle" was evidence of retaliatory harassment.

- With regard to plaintiff's allegation he no longer received "awards and bonuses" after joining the class action lawsuit, defendant argues, "For a significant portion of the time period at issue, there was freeze on awards and bonuses." [Declaration of Mary Jo Britt]

## II.  LAW & ANALYSIS

### A.  Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."  Fed. R. Civ. Proc. 56(b).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).  Fed. R. Civ. Proc. 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Additionally, as stated in Capitol Indem. Corp. v. U.S., 452 F.3d 428, 430-31 (5th Cir. 2006):

> The moving party bears the burden of identifying an absence of evidence to support the nonmoving party's case.  Summary judgment is properly granted if the record does not contain appropriate summary judgment evidence which would sustain a finding in the nonmovant's favor on any issue as to which the nonmovant would bear the burden of proof at trial.

In evaluating the evidence provided in support of, and in opposition to, a Motion for Summary Judgment:

> The court must view facts and inferences in the light most favorable to the party opposing the motion. A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.

-21-

Credibility determinations are not part of the summary judgment analysis.  Hunt v. Rapides Healthcare Sys. LLC, 277 F.3d 757, 762 (5th Cir.  2001).

To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

## B.  Title VII

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on the individual's race, color, religion, sex or national origin.  Burlington Northern & Santa Fe Railway Co., v White, 126 S.Ct. 2405, 2408 (2006)(internal quotations omitted).  There are two requirements for filing a Title VII action in federal court: (1) the complaint must be filed within the time allotted by Title VII, and (2) the complainant must first have exhausted his or her administrative remedies.  Tolbert v. United States, 916 F.2d 245, 247 (5th Cir. 1990).  "Failure to comply with either of these requirements wholly deprives the district court of jurisdiction over the case; it is the well-settled law of this circuit that each requirement is a prerequisite to federal subject matter jurisdiction." Id.  In 1972, Congress extended Title VII to apply not only to private sector employment, but to employment within the federal government as well.  West v. Gibson, 527 U.S. 212, 214 (1999).

## 1.  Racial Discrimination

Title VII provides in pertinent part, "It shall be an unlawful employment practice for an employer...to fail or refuse to hire or to discharge any individual, *or otherwise to discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color... ." 42 U.S.C. § 2000e-2 (emphasis added) "A plaintiff can

prove a claim of intentional discrimination by either direct or circumstantial evidence. Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973)." <u>Russell v. McKinney Hosp. Venture</u>, 235 F.3d 219, 222 (5th Cir. 2000.)

First, plaintiff must establish a prima facie case of unlawful racial discrimination in violation of Title VII. <u>Id</u>. In order to do so, a plaintiff must show: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows others similarly situated were treated more favorably. <u>Okoye v. University of Texas Houston Health Science Center</u>, 245 F.3d 507, 512 (5th Cir. 2001).[37]

If a plaintiff is successful in establishing a prima facie case of discrimination, the burden then shifts to defendant to produce a legitimate, non-discriminatory justification for its actions. <u>Id</u>. If the defendant can articulate a reason that, it believed, would support a finding that the action was non-discriminatory, "the mandatory inference of discrimination created by the plaintiff's prima facie case drops out of the picture and the fact finder must decide the ultimate question: whether the plaintiff has proved intentional discrimination." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 146 (2000); <u>Okoye</u>, supra (internal quotations omitted) The Supreme Court has stated, "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." <u>Reeves</u>, supra. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employers asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully

---

[37] As plaintiff only listed the second half of element four of his prima facie burden, this Court presumes plaintiff is <u>only</u> bringing a claim for racial discrimination through disparate treatment (and not a claim of racial discrimination by way of unlawful discharge.)

discriminated." Id. at 148.

There is no dispute as to the first two elements of plaintiffs prima facie case.  The third element of plaintiff's prima facie case (plaintiff was subject to an adverse employment action), is in dispute.  Mr. Steward alleges primarily that the USMS discriminated against him by (1) transferring him from the Seized Assets Section to the Operations Section, (2) removing his collateral duty of "District Recruiter", (3) taking away the government vehicle assigned to him, and (4) subjecting him to "such intolerable conditions that Mr. Steward felt compelled to resign."[38] [Doc. 64, p. 12] However, as discussed in several conferences taking place on February 22 and 23, 2007, additional briefing is required as to the legal issue applicable to plaintiff's claim for disparate treatment and certain of plaintiff's factual allegations as they relate to plaintiff's claim alleging disparate treatment due to his race, prior to a ruling by the Court.[39]  The Court imposed deadline for any such briefing or motion as February 27, 2007 by 12:00 p.m.  Consequently, the Court DEFERS its ruling on defendant's Motion for Summary Judgment with regard to plaintiff's claim of unlawful racial discrimination as it relates to a claim of disparate treatment as a result of his race.

## 2.  Hostile Work Environment

Plaintiff also argues Title VII was violated as plaintiff was required to work in a discriminatorily hostile or abusive environment.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  "When the work place is permeated with 'discriminatory intimidation, ridicule, and insult,'

---

[38] As previously stated, constructive discharge is not before the court.

[39] While all parties seem to agree plaintiff's transfer/demotion to Operations is a discrete act of disparate treatment brought timely to the Court, whether the transfer/demotion is an "adverse employment action" under the law, particularly in light of the Supreme Court's recent decision in Burlington Northern & Santa Fe Railway Co., v. White, 126 S.Ct. 2405 (2006), remains in dispute.  Additionally, whether the discrete acts of disparate treatment such as denial of awards and bonuses, training, special assignments, etc. are timely and whether these acts are "adverse employment actions," is in dispute.  These issues are to be addressed in the supplemental briefing and motion by the government.

that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create

an abusive working environment,' Title VII is violated." Id. (quoting Meritor Sav. Bank, FSB v.

Vinson, 477 U.S. 57, 66-67 (1986)).

> This standard ... takes a middle path between making actionable any conduct that is
> merely offensive and requiring the conduct to cause a tangible psychological injury.
> As we pointed out in Meritor 'mere utterance of an ... epithet which engenders
> offensive feelings in an employee' does not sufficiently affect the conditions of
> employment to implicate Title VII.  Conduct that is not severe or pervasive enough
> to create an objectively hostile or abusive work environment - an environment that
> a reasonable person would find hostile or abusive - is beyond Title VII's purview.
> Likewise, if the victim does not subjectively perceive the environment to be abusive,
> the conduct has not actually altered the conditions of the victim's employment, and
> there is no Title VII violation.  Id.

In the Fifth Circuit, a plaintiff may establish a Title VII violation based on race

discrimination which creates a hostile work environment by proving the following: (1) he belongs

to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment of which

plaintiff complained was based on race; (4) the harassment affected a term, condition, or privilege

of employment; and (5) the employer knew or should have known of the harassment and failed to

take remedial action.  Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002).  However, where the

harassment is allegedly committed by a supervisor with immediate (or successively higher) authority

over the harassment victim, the plaintiff need only satisfy the first four elements listed above.

Celestine v. Petroleos De Venezuellas SA, 266 F.3d 343, 354 (5th Cir. 2001).

In order to affect a term, condition, or privilege of employment (element 4), the harassment

complained of must be "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment."  Id. (internal quotations omitted).  In

determining whether a workplace constitutes a hostile working environment, courts must consider

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (internal quotations omitted).

In the instant matter, Mr. Steward contends the USMS subjected him to a hostile work environment during his employment, due to his race and his prior complaints of discrimination. [Doc. 38, ¶7]  The first element of plaintiff's prima facie burden is undisputed.  With regard to the second element of plaintiff's prima facie burden – he was subject to unwelcome harassment – plaintiff has easily carried his prima facie burden with regard to this element. A brief review of plaintiff's allegations show a jury could easily find Mr. Steward endured unwelcome harassment while working for the Marshal Service.  If accepted by the trier of fact as true, plaintiff endured a work environment permeated with language derogatory toward African-Americans, conduct which more clearly surfaced immediately after plaintiff lodged his complaints with the Equal Employment Opportunity Office of the USMS, and was ostracized by employees and management.  Taking Mr. Steward's allegations as true, plaintiff also easily satisfies the third element of his prima facie burden, as it is patently obvious by the nature and content of the alleged harassing statements that the harassment was based on race.[40]

With regard to the fourth element of plaintiff's prima facie burden – the harassment affected a term, condition, or privilege of employment – the Court finds plaintiff has carried his burden for summary judgment purposes.  In support of this element, plaintiff alleges because of his race he was: (1) denied the opportunity to participate in training; (2) demoted from his position in Seized Assets to Operations; (3) removed from his previously held position of "District Recruiting Officer"; (4)

---

[40]  It defies logic that the terms "nigger", "oreo cookie", "jungle bunnies", etc. could be found not to have been, at least in part, based on anything other than race, and any argument to the contrary, it would seem, would be in direct contradiction to the accepted connotative meanings of at least the term "nigger" if not all of the complained of terms used.

denied use of his previously assigned government vehicle; (5) no longer assigned to multi-deputy details; (6) ostracized and alienated in an effort to force him to terminate his employment with the Marshal Service; (7) treated less favorably than other employees; and (8) no longer given awards or bonuses.  [Doc. 64, pp. 8-9] These actions, if true, grant a basis for the trier of fact to find the USMS in the Eastern District of Louisiana, New Orleans office, was permeated with discriminatory intimidation, ridicule and insult which was of a sufficiently severe and pervasive nature such that the conditions of Mr. Steward's employment were altered and caused him to endure an abusive working environment.

Finally, plaintiff argues the Court need not examine the fifth element of plaintiff's prima facie burden, as Mr. Steward alleges much of the harassment (i.e. the demotion, etc.) was committed by his supervisors.  Furthermore, plaintiff alleges the marshal  "admits to knowledge of most of the harassing incidents alleged by Mr. Steward...[i.e.] (1) the watermelon comment; (2) the 'Oreo' comment; (3) the use of the word 'nigger' in the workplace; (3) the 'should be in the backseat handcuffed' comment; (4) the grease placed on Mr. Steward's government vehicle; and (5) the 'Look out, there's a black guy with a gun behind you' comment."[41] [Doc. 78, p.32]

Defendant has argued the limitations period for bringing claims based on discrete discriminatory acts (i.e. termination, failure to promote, denial of transfer) as a basis for argument

---

[41] While the testimony provided shows the marshal did know about some of these incidents, it is not clear that he knew about all incidents (from what has been provided.)  However, defendant has not specifically disputed plaintiff's assertion that he need not put forth evidence with regard to this element (although it seems to be implied).  Defendant focuses it's defense on its argument that the acts complained of do not constitute racial harassment as a matter of law.  Nevertheless, the Court finds there are sufficient factual issues regarding whether or not the marshal knew or should have known of the harassment committed against Mr. Steward but failed to take remedial action, such that this issue should be decided by the trier of fact.  Additionally, there is testimony that Chief Zapalo, Sup. Dep. Brewer and Sup. Dep. Couret knew about certain alleged acts of the harassment, but failed to take sufficient, remedial action. [Zapalo affidavit, Boudreaux depo., p. 123; Couret depo., pp. 48, 51-2; Brewer depo., p. 49]

-27-

that plaintiff was subjected to disparate treatment as a result of his race have been brought before an EEO counselor within forty-five days of the discrete act.  Thus, defendant argues, plaintiff's claims for denial of a promotion and denial of training must be dismissed as untimely and/or as unsupported by any evidence.  However, defendant acknowledges the Supreme Court has held acts which fall outside of the time period for filing with the EEOC can be considered "as background evidence in support of a timely [hostile working environment] claim" as long as one act, which contributed to the hostile work environment, is timely reported.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 118 (2002).  If defendant is seeking to have plaintiff's hostile work environment claim dismissed as untimely, the request is DENIED.  Plaintiff filed his first complaint with an EEO counselor February 1, 2001.  Many of the acts of which plaintiff complained occurred in January 2001, and as such are timely.  Consequently the trier of fact may consider all background evidence in support of plaintiff's hostile work environment claim.  If, however, defendant is merely asking the Court to dismiss claims for denial of a promotion and denial of training, those specific claims are not before the Court.  (See n.2, supra)

Defendant argues "several of the offensive comments that the plaintiff complains of were also not brought to the attention of his employer."  However, for the reasons stated in n. 40, the Court finds this argument to be without merit for this claim.  Of interest, nothing in the U.S. Marshal's policy on harassment requires employees to report harassment to supervisors prior to reporting it to the EEO. [Pl. exh. 17]  Defendant argues on the few occasions when plaintiff's employer was made aware of offensive acts, immediate and appropriate action was taken.  This Court notes, however, that this fact is in dispute and consequently must be decided by the trier of fact. Defendant further argues "of the incidents that have any evidentiary support at all, most are not racial in context or cannot be objectively viewed as severe or pervasive harassment."  The Court

disagrees.  The "incidents" plaintiff complains of, many of which are admitted to, are of such a nature as to be open to interpretation by the trier of fact as patently racial, offensive, severe and pervasive.

Finally, defendant argues the actions taken against plaintiff (i.e. the alleged demotion, loss of use of a government vehicle, and reassignment of a preferred collateral duty) were not based upon his race, and argues plaintiff has cited no evidence to support management took these actions based upon race.  Plaintiff has cited the testimony of several employees, including Sup. Dep. Brewer, all of whom allege the actions taken against plaintiff were due to his participation in the class action race discrimination lawsuit.  Thus, this Court does not find defendant's argument persuasive for the reasons already noted by this Court supra.

The Court notes defendant devotes the bulk of its argument against plaintiff's hostile work environment claim to disputing plaintiff's allegations of fact and providing its own interpretation as to those allegations.  It is well established that summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show **there is no genuine issue as to any material fact** and the moving parties entitled to judgment as a matter of law."  FRCP 56(c) (emphasis added).  The interpretation and intent of the incidents involved are in great dispute, thus clearly making summary judgment inappropriate.

### 3.  Retaliation

Section  2000e-3(a) of Title VII - the anti-retaliation provision - forbids an employer from discriminating against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation.  Burlington Northern & Santa Fe Railway Co., v. White, 126 S.Ct. 2405,

2408 (2006) citing 42 U.S.C. §2000e-3(a)).  In order to make a prima facie showing of retaliation, a plaintiff must establish: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  Banks v. East Baton Rouge Parish School Board, 320 F.3d 570, 575 (5th Cir. 2003).[42]

When there is no direct evidence of retaliation (as in the instant matter)[43], a plaintiff may demonstrate discriminatory intent through the use of circumstantial evidence.  In such a circumstance, a retaliation claim is analyzed under the framework set forth in McDonnell Douglas, supra.  (See § II.B.1, supra)[44]

In the instant matter, there is no dispute plaintiff has satisfied the first element of his prima

---

[42] Regarding the second element (adverse employment action), the Fifth Circuit formerly held only "ultimate employment decisions," such as "hiring, granting leave, discharging, promoting, and compensation," were actionable "adverse employment actions."  See e.g. Hernandez v. Crawford Bldg. Material Co., 321 F.3d, F 28, 531 (5th Cir. 2003).  However, the Supreme Court's recent case Burlington Northern & Santa Fe Railway Co. v. White, supra, rejects the Fifth Circuit's "ultimate employment decision" standard for retaliation claims.  The new standard mandated by the Supreme Court holds retaliation is actionable if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id., 2415.  (internal quotations omitted).

[43] "Direct evidence is evidence which, if believed, proves the fact in question without inference or presumption.  For Title VII purposes, direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis - not necessarily the sole basis, but a basis - for the adverse employment action."  Fabela v. Sscorro Ind. School Dist., 329 F.3d 409, 415 (5th Cir. 2003) (internal quotations omitted).  Although plaintiff argues he has presented direct evidence in support of his retaliation claim by showing Marshal Serio was "pissed" when he found out about plaintiff's involvement in the class action suit and consequently removed plaintiff from Seized Assets and his District Recruiter duties, the Court finds the cases cited by plaintiff in support of its argument to be factually distinguishable.  The actions of Marshal Serio are circumstantial evidence of discrimination, not direct.

[44] Under the pretext framework, after the employee demonstrates a prima facie case of retaliation and the employer carries its burden by stating a legitimate non-retaliatory reason for the employment action, the burden falls to the employee to establish that the employers permissible reason is actually a pretext for retaliation.  Septimus v. University of Houston, 399 F.3d 601, 607 (5th Cir. 2005).

facie burden, as all parties agree Mr. Steward became involved in protected activity on September 8, 2000, when he became a class representative for a class action lawsuit filed against the U.S. Marshal Service alleging racial discrimination and a racially hostile work environment. [Doc. 64, p. 3]

In support of the second element of plaintiff's prima facie burden – that he suffered an adverse employment action – Mr. Steward argues the following occurred subsequent to his involvement in the class action lawsuit against his employer:  (1) he was denied the opportunity to participate in training; (2) he was demoted from his position in the Seized Assets unit to Operations[45]; (3) his collateral duty of "District Recruiting Officer" was taken away; (4) he was no longer able to use the government owned vehicle previously assigned to him; (5) his employer failed to assign him multi-deputy details following its knowledge of his involvement in the class action lawsuit; (6) subjected him to retaliatory offensive, threatening and demeaning slurs, jokes, remarks and ridicule[46]; (7) ostracized and alienated plaintiff and subjected him to further conduct in an effort

---

[45] Defendant argues the Operations Section and Seized Assets Section are of equal importance and prestige, and there is no evidence to support plaintiff's claim that his transfer was actually a demotion.  That fact is in dispute.  Mr. Steward has put forth evidence tending to show Operations was typically assigned to rookies, reassignments to Operations have been used in the past for punishment and working in Seized Assets greatly increases a deputy's chance for promotion. [See e.g. testimony of Goode depo., pp. 9, 29 (explaining his involvement with multi-million dollar seizures in the NASAF Section has "greatly boosted" his chance for a promotion); Brewer depo., pp. 56-7 ("If you go from Warrants to Operations, it's like a demotion. ...Operations was like the black hole. ...[NASAF] is more responsibility.  It's training.  It's technical training, specialized training. ... [Operations] is the lowest position that a deputy can hold."); Gibbs depo., p. 10; Zapalo affidavit]

[46] Mr. Steward provides the following, non-exclusive examples: (1) Dep. Boudreaux's statement to plaintiff on November 28, 2000 that he heard "ya'll got a lawsuit...I heard you people got a class action lawsuit going on....I hope you get a lot of money.  You'll need it to buy a car.  The Marshall is going to take your G-ride away from you."  Dep. Boudreaux then put his hand next to Mr. Steward's and said, "Do you think I can pass to get in on the lawsuit?"  (2) On or about January 2001, Dep. Boudreaux said to Mr. Steward that he used to think Mr. Steward was different but now sees that he is "just like the rest of 'them' who like to complain and file lawsuits."  (3) Management's statement to Mr. Steward's co-workers that there are "two teams in the Eastern District of Louisiana, 'the Marshal's team' and 'Jerry's team.'  If you're on Jerry's teams you will get the same treatment that Jerry does."

to force him to terminate his employment with the U.S. Marshal Service for the Eastern District of Louisiana; (8) unjustly and negatively impinged Mr. Steward's credibility and character; (9) vandalized a government vehicle issued to plaintiff; (10) treated him less favorably than other employees; (11) failed to award him awards and bonuses; (12) constructively discharged him in April 2002; (13) made false accusations and/or complaints against Mr. Steward to his subsequent employer; and (14) publicized false accusations and/or complaints made against him to employees of the U.S. Marshal Service for the Eastern District of Louisiana. [Doc. 64, pp. 3-4]  Based on the foregoing, the Court finds plaintiff has satisfied the second element of his prima facie burden.

Plaintiff has additionally carried his burden for the third element of his prima facie claim of retaliation – a causal link between the protected activity and the adverse employment action.  First, "close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001)(citing Swanson v. Jen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997)).  Further, the Evans court pointed out that "a time lapse of up to four months has been sufficient to satisfy the causal connection for summary judgment purposes." Id. (quoting Weeks v. NationsBank, N.A., 2000 WL 341257 at *3 (N.D. Tx. 2000).[47]

In the instant matter, it is undisputed management was aware of Mr. Steward's involvement in the class action discrimination suit on or around October 2000.  [See e.g., Zapalo aff., p. 3]  The decision to move plaintiff from NASAF to Operations was made sometime around November 2000.  Plaintiff's transfer became effective January 31, 2001.  Thus, plaintiff has established causation

---

[47] The Evans court noted, "'a plaintiff need not prove her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case.'" Id. (quoting Long v. Eastfield College, 88 F.3d 300, 305 (5th Cir. 1996)).

based on the one to three month lapse between the date management became aware of Mr. Steward's engagement in protected activity and the date of his transfer to Operations.[48]  Thus, Mr. Steward has carried his prima facie burden.

In response, defendant argues it had a legitimate, non-discriminatory reason for transferring Mr. Steward, in that Marshal Serio had begun an annual rotation plan which was "a legitimate management tool for effecting cross-training." [Doc. 58, p. 19] Defendant argues "the incoming supervisors would determine which deputies should be rotated to work with them in their new section, as they would be responsible for the work produced in that section, they were given the authority to determine which deputies would work with them, factoring in the deputy preferences, time in current position, stability needs of the section."[49]  [Id., p. 20]

Defendant additionally argues Sup. Dep. Couret had determined, "over the past six months to a year, [plaintiff] reached the "burnout" point – he was getting frustrated with the government attorneys, things were stacking up on his desk and he would wait until the last minute to serve them."[50]  [Id., p. 21]  Defendant argues Sup. Dep. Couret asked Mr. Steward if he was interested in

_____

[48] In addition to temporal proximity, Mr. Steward has also supported his allegation of causal connection by presenting evidence that Marshal Serio was upset with plaintiff for participating in the class action lawsuit and, in retaliation, he transferred plaintiff to Operations and reassigned him to a less prestigious collateral duty.

[49] The Court finds this argument by counsel is in dispute and is a genuine issue of material fact. See e.g., § IB, p. 9, n. 29.

[50] Plaintiff vehemently denies he was suffering from "burnout" and has submitted testimony of several USMS supervisor deputies and other employees to the contrary, *supra.*  Even Marshal Serio testified it was his "understanding from Herman Brewer and other supervisors, Ron Couret, that Jerry Stewards was doing a good job over there.  I was never made aware of any complaints against Jerry Steward on his work performance at all." [Serio depo pp. 61-2]

transferring to the Warrants Section, but that plaintiff stated he preferred not to go to Warrants.[51] Consequently, Operations was the only remaining option.

With regard to the reassignment of plaintiff's collateral duty, defendant argues that was part of the overall reorganization plan as well.  Defendant argues plaintiff had held that assignment for three years, so Sup. Dep. Brewer was rotated into that position.  Defendant further argues "the plaintiff missed the annual rotation of collateral duty assignments for the previous two years, and was overdue for a rotation to a new collateral duty assignment.  The plaintiff held a false sense of entitlement to the recruiter assignment."[52] [Id., p. 22]

Defendant argues plaintiff's loss of use of a government vehicle was not retaliatory or discriminatory because "the government vehicle is not an employee benefit since by regulation it must be used only in furtherance of the mission of the agency," and "the position in the Court Operation Section did not require that the plaintiff have the full-time use of a government vehicle."[53] [Id., p. 24]

In response to defendant's "non-discriminatory reasons" for its decision, Mr. Steward must show his employer's reasons are pretextual.  In support of this burden, plaintiff argues: (1) Marshal Serio had retaliatory animus towards plaintiff and made the decision to remove plaintiff from Seized Assets (thereby taking away his government vehicle) and to reassign plaintiff's collateral duty; (2) the open season rotations did not apply to Mr. Steward because he was permanently assigned to

---

[51] This fact is in dispute, as plaintiff denies he was ever asked if he wanted to transfer to Warrants.

[52] Plaintiff has submitted supporting evidence tending to show the reassignment of his collateral duty was an act of retaliation and is a less prestigious collateral duty.

[53] Plaintiff states in an affidavit other deputies assigned to Operations were able to use government vehicles. [Def. ex. F2]

Seized Assets as the "Street Supervisor;" (3) supervisory deputies were not able to decide which deputies were assigned to each section as defendant claims; (4) no other "Street Supervisor" deputies were rotated; (5) deputies have been placed in the Operations Section in the past as punishment; (6) in contrast to defendant's characterization of Mr. Steward having "burn-out", there is other testimony asserting plaintiff was an excellent employee; and (7) Marshal Serio is not a credible witness. Plaintiff has successfully carried his burden and shown there are genuine issues of material fact with regard to whether defendant's stated reasons are a pretext for discrimination.

### III.  CONCLUSION

Due to the foregoing, the Court finds defendant has failed to carry its burden of proof, and summary judgment is DENIED as to plaintiff's claims of: (1) racial discrimination through creation of a hostile work environment, and (2) retaliation due to plaintiff's involvement in protected activity. The Court DEFERS its ruling as to whether or not summary judgment is warranted for plaintiff's claim of racial discrimination resulting in disparate treatment.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 27th day of February, 2007.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE